48 CCPA

### Application of Carl Peter KRIMMEL.
### Patent Appeal No. 6692.

United States Court of Customs
and Patent Appeals.
July 21, 1961.

Watson, Leavenworth, Kelton & Taggart, John R. Janes, New York City (John T. Kelton, New York City, and Helmuth A. Wegner, Chicago, Ill., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.*

MARTIN, Judge.

This is an appeal from a decision of the Patent Office Board of Appeals affirming the examiner's rejection of all of the claims of appellant's application for a patent on "Glycosides of the Pyridone Series."

The appealed claims are for organic compounds with varying degrees of specificity. The following claims are representative:

"1. A glycoside of the formula

$$\text{HOCH}_2 \quad \overset{\displaystyle O}{\underset{\underset{R}{N}}{\diagdown}} \quad \text{O—Glycosyl}$$

wherein R is a member of the class consisting of hydrogen, lower alkyl radicals, and lower hydroxyalkyl radicals in which the hydroxyl group is separated from the cyclic nitrogen atom by at least two carbon atoms.

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of

Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28 United States Code.

"8. 1,4-Dihydro-1-( $\beta$ -hydroxethyl)-2-hydroxymethyl-4-oxo-5-pyridyl $\beta$ -D-glucopyranoside."

The application describes the preparation and certain of the physical properties of organic compounds within the scope of claim 1 which is the broadest claim. It appears that the examiner and the board found that the claimed compounds were new and unobvious. The sole ground of rejection relates to the utility of the claimed compounds. In this regard, the following paragraph of the specification is the only pertinent part thereof:

"The compositions of the present invention can advantageously be employed in pharmaceutical applications, because they are easily manufactured substances, of substantial water solubility, which exhibit certain of the useful properties of the adrenocortical hormones. Thus, they are anti-inflammatory agents, as shown by their effectiveness in treating inflammation of the iris. Likewise, they also resemble cortisone and hydrocortisone in producing a decreased in vascular permeability, by increasing the resistance of the vascular wall to injury. The compositions herein claimed are also anti-bacterial agents, and can specifically be employed in producing an inhibition of the growth of *Bacillus subtilis*."

Thus, in this paragraph appellant has alleged that the claimed compounds are useful because (1) they are anti-inflammatory agents; (2) they produce a decrease in vascular permeability; and (3) they are anti-bacterial agents.

In his first action, the examiner stated:

"All the claims are rejected for lack of utility in the absence of clear and convincing proof that the com-position is safe, effective and reliable for all the therapeutic effects with human beings set forth in the specification. No tests on human beings have been submitted. Such tests are necessary to establish therapeutic utility in cases of this nature. * * * Experimentation with animals is insufficient. * *"

Thus, it appears that the examiner's initial position was that not only must evidence be supplied to prove the allegations of utility but also human beings must be used as experimental subjects.

In response, appellant urged that he "does not allege utility in man, although he freely admits that the establishment of such utility is desired." It was then appellant's position that "it is quite obvious that since inflammatory conditions such as iritis [1] occur in such pets as dogs, this alone would be sufficient utility for the purposes of the patent statutes" and further, "there is certainly no reason apparent why the examiner should not believe the truth of the utility allegation mode."

Thereafter, in a final rejection, the examiner stated: [2]

"Applicant's arguments have been carefully considered but the rejection of the claims for lack of utility is adhered to.

\* \* \* \* \* \*

"In cases where a therapeutic utility is alleged the mere statement of utility, unsupported by clear and convincing proof of said utility, is insufficient to meet the statutory requirement of utility. This is particularly true in the instant application since the utility of the claimed compounds is not obvious."

Subsequent to the examiner's final rejection, appellant submitted an affidavit of Victor A. Drill which describes the

---

1. Dorland's "Illustrated Medical Dictionary," 23rd Ed., p. 693 (1957) defines "iritis" as follows: "Inflammation of the iris, usually marked by pain, congestion in the ciliary region, photophobia, contraction of the pupil, and discoloration of the iris."

2. Although the examiner here did not expressly repeat the requirement that tests be made with human subjects, it is clear from subsequent communications between the examiner and appellant that both understood that the examiner intended to persist in this requirement.

evaluation of two of the claimed compounds for effectiveness in preventing iritis in rabbits, in decreasing vascular permeability in the hamster cheek pouch, and in inhibiting the growth of *Bacillus subtilis* on agar. The affidavit was intended to provide proof that "the compounds of this application do, in fact, possess the three fields of activity recited in the application."

The examiner considered this affidavit but adhered to his rejection of the claims. In his answer to appellant's brief before the Board of Appeals, the examiner stated:

"All the claims are rejected for lack of utility in the absence of clear and convincing proof that the compounds claimed are safe, effective and reliable for all therapeutic effects with human beings set forth in the specification."

The examiner was of the opinion that the "pharmaceutical applications" described in appellant's specification "clearly relate to the medical treatment of human beings." Accordingly, the examiner held that the tests on rabbits set forth in the Drill affidavit "cannot be accepted as providing that the compounds are safe and are effective in man," that, as to the tests on hamsters, "in the absence of clinical tests on humans, there is inadequate proof of utility," and that proof of the inhibition of growth of *Bacillus subtilis* "is not considered of sufficient utility within the meaning of the statute nor is there sufficient teaching in what respect the compounds are useful."

The board affirmed the examiner, apparently interpreting his rejection as being based on a finding that there is *"lacking the necessary statutory utility to support a patent."* (Emphasis ours.) The board stated in part:

"Since our interpretation of the statement of utility in the specification coincides with that of the examiner, we think it becomes necessary for appellant to establish usefulness of his compounds for treating human beings. This he has not done; nor has he denied the need for such

proof in the case of a specification asserting therapeutic utility in humans."

The board limited its consideration of the Drill affidavit to the rabbit tests described therein, stating with regard to the hamster test and the *Bacillus subtilis* growth inhibition tests:

"* * * While appellant has urged that the last two tests are suggestive of certain utilities, there is nothing in the specification which would support these specific allegations. Consequently, no further attention will be paid to this part of the alleged proof. * * *"

Another pertinent part of the board opinion is as follows:

"We are not aware that any breeder of experimental animals, such as mice, guinea pigs or rabbits, has ever administered medication thereto for the sole purpose of saving such animals. In general, their economic value is insufficient to warrant treatment. The Patent Office has heretofore regarded this type of test as simply a necessary preliminary step in the process of evaluating any new drug prior to clinical use on humans, or in the case of veterinary medicine on the commercially valuable animals, but not as establishing usefulness within the meaning of 35 U.S.C. 101. Any compound which has not been carried beyond this stage of experimentation we think may properly be regarded as of merely speculative or at best potential utility. We believe appellant will concede that in thousands of cases, promising animals tests have failed to prove out on humans."

Thus, the basic position of the board appears to have been that utility within the meaning of 35 U.S.C. § 101 had not been established because the results of clinical tests on humans had not been submitted.

Both appellant and the solicitor for the Patent Office have suggested different specific issues for us to decide. We

prefer to approach the problems of this case somewhat differently.

Appellant considers that he has set forth in his application three specific uses for his invention. The board was of the opinion, however, that the teaching that the claimed compounds be used to decrease vascular permeability or to inhibit the growth of *Bacillus subtilis* was only "suggestive of certain utilities" and thus apparently not sufficient allegation of utility per se to satisfy the requirement of 35 U.S.C. § 101. Although appellant disagrees vigorously with this holding and has assigned it as error in his notice of appeal to this court, we find it unnecessary to consider these issues. Hence, we expressly do not decide whether an allegation that claimed compounds will decrease vascular permeability or will inhibit growth of *Bacillus subtilis* is sufficient to satisfy the requirement of 35 U.S.C. § 101. Rather, we will direct our attention to the allegation that the claimed compounds are effective in treating inflammation of the iris. There appears to be no dispute that compounds effective for this purpose are useful within the meaning of 35 U.S.C. § 101.

As discussed earlier in this opinion, the initial position of the examiner was that appellant must supply evidence that the claimed compounds are effective not only in treating iris inflammation generally but specifically in treating the human iris. The initial position of appellant was that he need not meet either of these requirements. Subsequently, however, appellant supplied evidence in the form of the Drill affidavit purporting to demonstrate the effectiveness of one of the claimed compounds in preventing development of iritis in the rabbit eye. Although at the time of submitting this evidence, appellant stated that he "wishes to reserve his right to argue in the event that an appeal is necessary, that in cases of this type, the examiner is not entitled to demand a showing of the veracity of the statement of utility," and although appellant now urges in his brief before this court that "it was un-necessary for him to do so, and that the Patent Office was in error in requiring it," this point has not been assigned as a specific error in the notice of appeal to this court and, furthermore, evidence as to the utility has been submitted. For these reasons, we expressly do not decide whether an applicant must, in a situation as is now at bar, provide evidence or proof that claimed compounds are useful for a purpose stated in a patent application. Rather, we will decide this case on the basis of the evidence before us.

We turn now to the Drill affidavit, the pertinent parts of which are as follows:

" * * * He [Victor A. Drill] is a physiologist and physician by training and experience, having received the degree of Doctor of Philosophy in physiology from Princeton University in 1941 and the degree of Doctor of Medicine from Yale University in 1948. He is the Director of Biological Research for G. D. Searle & Co. of Chicago, Illinois, and has, since 1953, been responsible for all animal experimentation associated with drug development and evaluation conducted by that firm.

"He is acquainted with the invention of Carl Peter Krimmel relating to glycosides of the pyridone series described and claimed in the above-entitled application. He is conversant with the tests employed to establish the pharmacodynamics of the said compounds, these tests being of a standardized type generally carried out under his supervision.

"In particular, he is in a position to confirm that the compounds of this invention have anti-inflammatory effects, as shown by their effectiveness in treating inflammation of the iris. * * *

"Anti-iritic activity was established by a technique adapted from the method of Woods and Wood, Bulletin of Johns Hopkins Hospital,

87, 482 ff., November, 1950. Each of a group of six normal rabbits is given an anterior chamber injection of 0.05 cc. of a 1:12,000 dilution of jequirity infusion in one and a mixture of 0.05 cc. of the same solution plus not more than 500 $\gamma$ of the test compound (in this case 250 $\gamma$ of 1, 4-dihydro-1-( $\beta$ -hydroxyethyl)-2-hydroxymethyl-4-oxo-5-pyridyl $\beta$ - D-glucopyranoside, the product of Example 6) in the other eye. The eye treated with the jequirity solution alone develops an inflammation characterized particularly by hyperemia of the iris, and serves as a control. Coadministration of an active anti-inflammatory agent such as cortisone prevents the development of the iritis. The test compound, in this case, inhibited the iritis and no toxic reactions were observed in the course of this or any of the other experiments. * * *"

■ It is appellant's position before this court that the sufficiency of this affidavit as a showing of the effectiveness of one of his compounds as an anti-iritic agent in rabbits was not disputed by the examiner or the board. Our study of the record leads us to agree with this position. The sole criticism of the examiner and the board was that the affidavit does not include tests with humans. At oral argument, however, the solicitor urged that the affidavit was insufficient for other reasons [3] and should be given little weight as a showing of what it purports to establish. Regardless of the solicitor's arguments and whether he has the right to raise this question for the first time before us, we believe the affidavit establishes a *prima facie* case that the claimed compound recited therein has the property which it is alleged to have. Neither the examiner nor the board challenged the qualifications of Dr. Drill as an expert, and the expressions of fact and opinion in the affidavit remain unrebutted except by the solicitor. Since the affidavit was before the appropriate experts in the Patent Office, we will assume it does establish what it purports to establish, notwithstanding the criticisms of the solicitor.

■ This brings us to what we consider to be the main issue and we accept the following statement of the solicitor:

"* * * The issue * * * is whether a test restricted to a laboratory animal is sufficient to satisfy the utility requirement of the statute when a patent application discloses that claimed compounds are useful in the treatment of a condition which can occur both in man and in lower animals, and it is agreed that the disclosure does not exclude the treatment of man. * * *"

Although we are aware of the obvious utility of a compound which will alleviate or cure iritis in a child's beloved pet rabbit or in the stock of a commercial rabbit breeder who derives income from the sale of rabbit fur and meat, in deciding this issue, we will consider the rabbits used by Dr. Drill in his tests solely as experimental animals and we will agree with the board for the purposes of this discussion only that the economic value of such animals as property is insufficient to warrant treatment solely to maintain their well-being.

With this consideration in mind, we hold that appellant has satisfied the utility requirement of 35 U.S.C. § 101 and is entitled to the patent grant for which he has applied.

In reaching this conclusion, we have noted that appellant in his brief before this court has stated that the reference to "pharmaceutical applications" in his specification "neither excludes the human body nor expressly includes it." It is the position of the solicitor, on the other hand, that the term "pharmaceutical" "would naturally suggest use in humans"

---

3. For example, the solicitor urged that the method of Woods and Wood was not followed exactly and that more details of the experiments and results should have been presented.

and that preparations "which are intended for use on lower animals are usually characterized as *veterinary* preparations." No authority has been presented to us for this latter position and we have not found that the standard dictionaries make this distinction.[4] In our opinion, therefore, "pharmaceutical applications" includes treatment of all animals and is not limited to treatment of humans. Consequently, appellant has established by the Drill affidavit that one of his claimed compounds is indeed useful for a purpose alleged in his application. In our opinion, he need do no more to satisfy the requirement of 35 U.S.C. § 101 that the claimed invention be useful. We do not agree with the solicitor that appellant's *immediate* aim was to use the compounds to treat human iritis. Even though there appears to be no question that his *ultimate* purpose was to do this, the lack of proof of the effectiveness of the compounds for this purpose is not determinative of the issues here.

We wish to point out that this court is aware of the common practice of using "experimental animals" in considerable variety for the evaluation of chemical compounds for possible pharmaceutical applications prior to clinical testing on humans. It is also our understanding that a demonstration that a compound has desirable or beneficial properties in the prevention, alleviation, or cure of some disease or manifestation of a disease in experimental animals does not necessarily mean that the compound will have the same properties when used with humans. With this information in mind, we hold that when an applicant for a patent has alleged in his patent application that a new and unobvious chemical compound exhibits some useful pharmaceutical property and when this property has been established by statistically significant tests with "standard experimental animals," sufficient statutory utility for the compounds has been presented. By "standard experimental animals," we mean whatever animal is usually used by those skilled in the art to establish the particular pharmaceutical application in question. These may be mice in one case, rabbits in another, chickens in another, and monkeys in another.

We hold as we do because it is our firm conviction that one who has taught the public that a compound exhibits some desirable pharmaceutical property in a standard experimental animal has made a significant and useful contribution to the art, even though it may eventually appear that the compound is without value in the treatment of humans.

The solicitor has also urged that utility has not been established in this case because the rabbit tests set forth in the Drill affidavit have not been correlated with utility in the treatment of human iritis. Although this type of correlation has not been expressly presented, we do not agree that it is necessary in this case. We have concluded from the record as a whole including portions of the article by Woods and Wood[5] cited in the Drill affidavit that rabbits, which were used by Dr. Drill, are standard experi-

---

4. The following definitions from Funk & Wagnalls "New Standard Dictionary" (1938) are pertinent:
    pharmaceutical * * * *a*. Of, pertaining to, or relating to pharmacy.
    pharmacy * * * *n*. * * * 1. The branch of materia medica that treats of the compounding of drugs and other substances for use in medicine, including also their collection, preservation, and identification; the art or business of compounding and dispensing medicines. * * *

materia medica * * * *Med.* 1. The branch of medical science that relates to medicinal substances, their nature, sources, mode of administration, and effects upon the animal economy. 2. The substances employed as remedial agents.
    medicine *n*. * * * 2. The healing art; the science of the preservation of health and of treating disease for the purpose of cure, * * *.

5. Unofficial copies of portions of this article were handed to the court by the solicitor at oral argument.

mental animals in studies of the treatment of eye inflammation. We do not believe it would be realistic to think that rabbits would be used in studies of eye inflammation unless the experimental results could be correlated with studies on human eye inflammation, and we believe that one skilled in the art can be expected to make this correlation himself.

One final point remains for our consideration. Both the examiner and the board have cited Isenstead v. Watson, D.C.D.C.1957, 157 F.Supp. 7, as authority for their requirement that appellant establish that his claimed compounds are "safe, effective and reliable" for treating human beings since the utility alleged did not exclude humans. That case was an action under 35 U.S.C. § 145 and, on motion of the plaintiff, was tried *in camera*. It appears only that the application involved related to "a medical compound for the purpose of testing the function of the human liver" and that the only claim at issue covered "a composition of matter adapted to shift blood proteins, consisting of three different substances" with the quantity of each ingredient being specified in the claim. It had been the position of the Patent Office that "the proof of utility was inadequate and insufficient." The District Court stated in part: [157 F.Supp. 9]

> "Great care and scrutiny should be particularly taken in connection with applications for medical patents. While the granting of a patent does not legally constitute a certificate that the medicine to which it relates is a good medicine and will cure the disease or successfully make the test which it was intended to do, nevertheless, the granting of such a patent gives a kind of official imprimatur to the medicine in question on which as a moral matter some members of the public are likely to rely. In view of these circumstances, it is right and proper that the Patent Office should be very careful and perhaps even reluctant to grant a patent on a new medical formula until it has been thoroughly tested and successfully tried by more than one physician. It seems to the Court that therefore the Patent Office, as a matter of public policy, followed a proper course in this matter."

Because we do not know the factual background which motivated this statement of the court, we do not know what principal of law has been established and, therefore, the case cannot be the basis of our determination of the issues now before us.

Although we have no doubt that the Patent Office has, in the case at bar, acted in good faith and with proper motives, the fact remains that the Patent Office has not been charged by Congress with the task of protecting the public against possible misuse of chemical patents. There is nothing in the patent statute or any other statutes called to our attention which gives the Patent Office the right or the duty to require an applicant to prove that compounds or other materials which he is claiming, and which he has stated are useful for "pharmaceutical applications," are safe, effective, and reliable for use with humans. It is not for us or the Patent Office to legislate and if the Congress desires to give this responsibility to the Patent Office, it should do so by statute.

We now hold only that appellant has established that his compounds have statutory utility even though he has not proven that they have the ultimate utility—prevention, alleviation, or cure of a disease in the human body. In this instance, appellant has proven sufficient utility to satisfy the requirement of 35 U.S.C. § 101.

The decision of the Board of Appeals is reversed.

Reversed.

WORLEY, C. J., concurs in result.

KIRKPATRICK, J., sat but did not participate in decision.