53 CCPA

**John C. KRANTZ, Jr., and Louise Speers Croix, Appellants,**

v.

**John F. OLIN, Appellee.**
**Patent Appeal No. 7415.**

United States Court of Customs and Patent Appeals.
March 10, 1966.

H. Hume Mathews, Melford F. Tietze, Murray Hill, N. J., for appellants.

William M. Epes, King of Prussia, Pa., Emil W. Milan, King of Prussia, Pa., (William A. Smith, Jr., Washington, D. C., of counsel), for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

RICH, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority to appellee Olin, the senior party, in interference No. 91,447 between Krantz et al. application serial No. 657,-482, filed May 7, 1957, for "Pharmaceutical Agent," and Olin application serial No. 37,035, filed June 20, 1960, for "Chemical Product," a continuation of application serial No. 556,056, filed December 29, 1955.

The Krantz et al. application is assigned to Air Reduction Company, Inc., of New York. Pennsalt Chemicals Corporation, of Pennsylvania, is assignee of the Olin applications.

In declaring the interference the examiner accorded Olin the benefit of the filing date of his earlier application, thereby making him senior party.

The sole count, which originated as claim 15 of the Krantz et al. application and was suggested by the examiner to Olin for the purpose of contesting priority, reads:

A process which comprises reacting 2,2,2-trifluoroethyl p-toluene sulfonate with an alkali metal 2,2,2-trifluoroethanolate and obtaining 2,2,2,2',2',2'-hexafluorodiethyl ether as a product therefrom.[1]

---

1. This product, the patentability of which is still in dispute so far as the record shows, has been approved by the Federal Food and Drug Administration and is now marketed under the trademark "Indoklon." It has been found to be a "potent convulsant" and is used in the treatment of mental illness. A motion by appellants to add a count directed to this compound was denied. Its simple formula is: $CF_3-CH_2-O-CH_2-CF_3$. It is also known as bis (2,2,2-trifluoroethyl) ether and so referred to by Olin.

In the proceedings below, the parties filed a stipulation of facts and stipulated testimony in lieu of taking testimony. They also filed briefs and were represented at final hearing.

Part of the board's decision was that Olin, on the facts stipulated, did not have an *actual* reduction to practice and that he was not entitled to an award of priority on that basis. That issue is not before us because it was not raised on appeal by either party. With respect to it we wish it to be clearly understood that our decision herein is not to be taken as an approval of that holding or of the reasons given in the board's opinion in support thereof.

The board's award of priority to Olin was on the ground that he had a *constructive* reduction to practice of the process of the count as of the date of his parent application, December 29, 1955, prior to the filing date of Krantz et al., May 7, 1957, the board further holding that all of the proofs of Krantz et al. for an actual reduction to practice were subsequent to Olin's effective filing date. Since Krantz et al. expressly approve the last-mentioned finding of the board, it is not before us and, again, it is to be understood that this decision is not to be taken as an approval of it or the reasons in support of it.

The issue on appeal is a narrow one. As Olin states it, it is simply whether he constructively reduced to practice by filing his parent application. Krantz et al. say that the decision of the board "is clear and correct in every material respect save one:—the Board erred in holding that the parent Olin case * * * is (was) a complete and allowable application and that Olin is entitled to the 1955 filing date of his said parent application, for a constructive reduction to practice of the count."

Appellants' attack on Olin's applications is based on three main contentions:

(1) that Olin intentionally included categorical disclosures or statements of utility for the compound produced by the claimed process and that these statements have been shown during the interference "to be in at least material part incorrect and misleading," (2) that Olin excluded or omitted information known to him at the time of filing which has been shown "to be of great importance to the proper and safe practice of the claimed new process and of the disclosed uses of the new compound produced thereby," and (3) that Olin has failed "to remove from the application the said misleading statements or to include or attempt to include therein the said omitted information." As may be seen, point (3) is somewhat repetitive of points (1) and (2).

Appellants carefully point out that the issue, in their opinion, is whether under these circumstances the Olin parent application can properly be considered complete and allowable,[2] and thus constitute a constructive reduction to practice of the process invention of the count.

Olin's applications both say (bracketed numbers inserted):

> The resulting new chemical compound of my invention, bis(2,2,2-trifluoroethyl) ether, is a colorless liquid which vaporizes readily at ordinary temperatures and [1] has useful solvent properties. For example, it may be used to prepare pastes or dispersions of high molecular weight fluorine compounds such as fluorocarbon waxes. [2] It also may be used to soften or solubilize polymeric materials, e. g., synthetic fibers. [3] It is chemically reactive and may be used in the preparation of other flourinated compounds.

This passage, particularly the three numbered portions, constitutes all of the positive disclosure upon which appellants' objections are based.

---

**2.** Whether this issue is ancillary to priority is itself a potential issue (see Glass v. DeRoo, 239 F.2d 402, 44 CCPA 723), but will not be considered since it has not been raised.

As to disclosure [1], appellants contend the evidence shows that Olin, at the time of filing, had no experimental basis for such assertion and that, while his "guess" turned out to be correct as shown by the Neeley and Wamser affidavits introduced by appellants, one wishing to prepare the new compound and use it should first be informed of the following "caution" Olin had received from his pharmacologist Latven: "Thus it is apparent that this compound is extremely toxic and is absorbed systemically within seconds following inhalation. WE URGE YOU TO TAKE EVERY PRECAUTION IN HANDLING THIS MATERIAL AND TO AVOID ACCIDENTAL INHALATION AT ALL COSTS. You can imagine what might happen if the glass container were accidentally dropped and broken on the laboratory floor." Absent such information, say appellants, Olin's teaching of the use of the new chemical as a solvent to form a paste or dispersion is "misleading to the ordinary chemist who might attempt to follow the teaching of Olin according to the ordinary and normal meaning of the words and statements used in the Olin application."

As to disclosure [2], appellants point to evidence showing they tried the new compound with a number of synthetic fibers and found it would not soften or solubilize polystyrene, "Nylon," "Mylar," "Orlon," "Dacron," "Acrilan," and "Dynel," but that it did soften or swell polyethylene and cellulose acetate "to some extent." Polyvinylidene chloride was "slightly soluble" and polymethacrylate was said to be the only one "significantly soluble." Olin testified that he never tested or used the new compound to soften or solubilize a synthetic material.

As to disclosure [3], again Olin testified that he had never chemically reacted the new compound. Appellants' "experts" Wamser and Neeley found it to be "extremely stable."

The board's response to appellants' position was:

We cannot agree with Krantz et al's. position that the subject matter of the Olin applications is dangerous to the public and for that reason cannot serve as constructive reductions to practice. The record is decidedly to the contrary. It shows that the compound was safely handled while it was being prepared, and used for experimental and testing purposes. * * * It is, therefore, unnecessary to explore this aspect of the case in any great depth. There is of record pages 7 to 23 of The Handbook of Solvents, Scheflan and Jacobs, Tab 29, which are devoted to "Safe Practices in the Use of Solvents." On page 22, examples of labeling "dangerous" solvents, recommended by the Manufacturing Chemists Association, are given. The handbook article shows that a good many solvents are more or less hazardous to use, but this fact alone does not prevent their use.

A similar situation exists in the case of drugs where the question of safety in humans was raised by the Patent Office. The Court of Customs and Patent Appeals has expressed its views regarding this subject. In In re Krimmel, 48 CCPA 1116, 292 F.2d 948, 773 O.G. 607, 130 USPQ 215, 220, the Court said:

* * * the fact remains that the Patent Office has not been charged by Congress with the tasks of protecting the public against possible misuse of chemical patents [materials].

And in In re Hartop, 50 CCPA 780, 311 F.2d 249, 787 O.G. 235, 135 US PQ 419, 428, the Court, after an extended discussion of "safety" reiterated its position as set forth in its earlier decision, In re Krimmel, supra.

In short we fail to find any substance in the "safety" argument pressed by Krantz et al.

Nor do we agree with Krantz et al's. contention that the Olin applications are not constructive reductions

to practice because Olin did not test for any of the utilities set forth in his applications. * * *

The difficulty with Krantz et al's. position is that Speers, Krantz's co-inventor, did make pastes or dispersions of fluorocarbon waxes as set forth in the Olin applications; * *. As stated in Robinson On Patents, (1890) Vol. 1, page 464, "When actual utility exists, its degree is unimportant." On page 466 of the same work, "a patent is valid if the invention serves any use though it will not apply to all uses claimed for it;" see Phillips v. Risser (1885) 26 F.R. 308. In Landon v. Ginzton et al., 41 CCPA 950, 214 F.2d 160, 688 O.G. 213, 102 USPQ 230, 233, the Court said:

> The patent application may reveal a number of purposes for the same invention. The inventor need prove only one practical use; only one useful result or effect.

* * * See also Friedman [Freedman] v. Overseas Scientific Corporation et al. (CA-2), 248 F.2d 274, 115 USPQ 42, 44, wherein it was held:

> An article invented may have patentable utility even though the patented device is not unfailingly operable in all its applications. Hildreth v. Mastoras, 257 U.S. 27 [42 S.Ct. 20, 66 L.Ed. 112].

Since there is proof of one of the disclosed utilities, it is unnecessary to reach the other uses set forth in the Olin specification.

Krantz et al. also contend that the Olin applications should contain a warning of the danger to people of the ether. We are not impressed by this argument. The specification is addressed to persons skilled in the art. Moreover, the "safety" aspect of the case has been discussed above and need not be repeated.

Krantz et al's. contention that the Olin applications are not constructive reductions to practice because Olin "guessed" at the disclosed utilities must be rejected. The answer to this argument is supplied by the case Automatic Weighing Machine Co. v. Pneumatic Scale Corp. Ltd. (CCA-1), 166 Fed.Rep. 288, 1909 C.D. 498, 506, 507. The Court, in that case, referred to the Supreme Court holding in the Telephone Cases [126 U.S. 1, 8 S.Ct. 778, 31 L.Ed. 863], 126 U.S. 1535, 1888 C.D. 321. There, when Bell applied for his patent he had never actually transmitted, telegraphically, spoken words so that they could be distinctly heard and understood at the receiving end of his line. But in his specification he described with sufficient precision to enable one of ordinary skill in such matters to make an apparatus, which, if used in the way pointed out, would produce the required effect, receive the words, and carry them to and deliver them at the appointed place.

The Supreme Court said in that case:

> The law does not require that a discoverer or inventor, in order to get a patent for a process, must have succeeded in bringing his art to the highest degree of perfection. It is enough if he describes his method with sufficient clearness and precision to enable those skilled in the matter to understand what the process is, and if he points out some practicable way of putting it into operation.

Clearly, Olin has complied with the law as set forth in the foregoing excerpt. The record shows that Speers produced pastes and solutions of fluorocarbon waxes, as pointed out above. Therefore, it is our view that the Olin cases are complete and allowable applications and that Olin is entitled to the filing date of his parent application, namely, December

29, 1955, for a constructive reduction to practice of the count; the Automatic Weighing Machine case, supra.

We agree with the foregoing reasoning of the board in disposing of appellants' arguments. That being so, we do not accept appellants' contention that a decision in their favor is compelled by In re Citron, 325 F.2d 248, 51 CCPA 852, the case alleged to be closest in point. That case is entirely distinguishable on the facts, for the application there asserted a use of "much public importance," namely the effective treatment of cancer, which assertion was believed to be incredible in light of the knowledge of the art. Nothing to the contrary being shown, we affirmed the rejection in *Citron* of all claims, regardless of type. Here, asserted utilities have been shown to exist.

Appellants suggested at argument that we should apply the law of contracts as set forth in 17 C.J.S. Contracts § 155, note 48, to the effect that while there may be no obligation to disclose a fact, such a particular utility of a compound made by a process, if it *is* disclosed in an application the *whole* truth about it must be told, such as the toxicity of a material alleged to be useful as a solvent. We would suggest that this is not a contract case and that an applicant for a patent, notwithstanding the popular myth that a patent is a contract, is not negotiating a contract with the Government. Rather, he is applying for a grant in accordance with a statute under which the right to a patent depends on compliance with the statutory terms and conditions. The prosecution of an application is not bargaining but a process of demonstration and persuasion that the statute has been complied with. The examiner was persuaded that Olin had complied and the Board of Patent Interferences was not persuaded to the contrary by Krantz et al. Nor are we.

The decision of the board is affirmed.

Affirmed.

WORLEY, C. J., concurs in the result.

SMITH, Judge (concurring), with whom MARTIN, Judge, joins.

The weakness of appellants' case is manifest. They conceived the invention in issue subsequent to appellee and filed their patent application subsequent to appellee's parent application. Appellants' proofs of an asserted actual reduction to practice establish a date subsequent to the date of appellee's constructive reduction to practice.

While appellee failed to prove an actual reduction to practice to the board's satisfaction, priority of the invention was awarded on the basis of appellee being the first to establish a constructive reduction to practice. To prevail here, appellants must establish that appellee was improperly given the benefit of the earlier filing date of a parent application. They seek to do so by asserting that appellee's applications

> can not, under the applicable law, be taken or regarded as complete and allowable applications and that Olin is *not* entitled to the filing date of his parent application * * * for a constructive reduction to practice of the count.

The *theory* of appellants' case is that if it can be shown that Olin did not file "complete and allowable" applications, appellee is not entitled to rely upon them to establish a constructive reduction to practice. In this case appellants, by reason of their filing date, would then be entitled to the award of priority. The *arguments* urged and authorities cited in support of appellants' *theory* are confused and I do not find them to be persuasive.

Appellants assert that appellee's applications are not "complete and allowable" essentially for two reasons: (1), Olin did not disclose in his application that the product made by the process defined by the count was "dangerous" because of

its usefulness as a convulsant agent;[1] and (2) while the count relates to a process, Olin did not actually make the products which he stated in his specification could be prepared from the product of the process.

As authority for the proposition that appellee failed to file a "complete and allowable" application, appellants cite 35 U.S.C. § 112, 35 U.S.C. § 282, and Union Carbide & Carbon Corp. v. Stuart Laboratories, Inc., 194 F.2d 823, (3rd Cir. 1952). These authorities will be considered individually.

First, considering 35 U.S.C. § 112, appellants argue that *because* appellee failed to disclose that the product made by the process was useful as a convulsant, *it follows* that the disclosure failed to set forth, "in such full, clear, concise, and exact terms as to enable any person skilled in the art" to "make and use" *the process*. I fail to understand the relationship between such cause and effect reasoning. Appellants admit that the appellee's disclosure does teach one of ordinary skill in the art how to practice the process defined by the count. It seems to me, therefore, that this satisfies the terms of section 112. Swain et al. v. Crittendon, 332 F.2d 820, 51 CCPA 1459.

Appellants' reliance on section 112 is unfounded for another reason. The board in its opinion found that appellee's right to the filing date of his parent application was "not in dispute here." That is to say, appellee is entitled under 35 U.S.C. § 120 to rely on the filing date of his parent application. This would seem to be tantamount to a finding that the terms of 35 U.S.C. § 112 were satisfied by the parent application. See *Swain*, supra. I am unable to understand how appellants can consistently concede that section 120 is satisfied and yet argue that section 112 has not been complied with.

As the majority opinion notes, we are first required to assume that the matters raised by appellants are ancillary to priority. I would add that we are also asked to assume that while the conditions of 35 U.S.C. § 120 have been met by appellee, we are expected to go further and decide whether appellee's parent application was "complete and allowable" as filed, for alleged failure to comply with 35 U.S.C. § 112. The Patent Office has not raised any question about the compliance of appellee's parent application with the conditions of section 112. It seems to me on the present record that appellee's parent application complies with section 112 and that appellee was properly permitted to rely upon its filing date as appellee's date of a constructive reduction to practice.

Appellants also allege, without setting forth any explanation or reasoning, that the terms of 35 U.S.C. § 282 have not been complied with. Independent investigation reveals that section 282 provides as a defense in an infringement suit the "[i]nvalidity of the patent * * *' on any ground specified in part II of this title [Patentability of inventions and grant of patents] as a condition for patentability," and "[i]nvalidity of the patent * * * for failure to comply with any requirements of sections 112 or 251 [Reissue of defective patents] of this title." I am at a loss to see how these sections aid appellants in estab-

1. This is the apparent source of conflict between the parties. Olin's agent stated in a report dated August 29, 1955 that "violent clonic convulsions appeared in the mice within twenty (20) seconds," after inhaling the product made by the process. Olin's agent testified that this was "opposite to what was anticipated." Olin testified that he had expected the product would be "an anesthetic of low toxicity." Olin filed an application disclosing the product and the process. He did not disclose or claim use of the product as a convulsant. Krantz also conducted experiments with mice in January, 1956, and discovered the convulsant properties of the product. They then conducted experiments with humans beginning in September, 1956, and finally filed an application disclosing and claiming the process, the product made by the process and the use of the product as a convulsant agent. The record shows that the Patent Office, prior to the interference, considered the product to be unpatentable over the prior art and refused to add a count, upon appellants' motion, defining the product, to this interference.

lishing that appellee's parent application as filed was incomplete. It seems to me that appellants' unsupported and broad allegation that Part II of Title 35 (35 U.S.C. §§ 100–188), has not been complied with, is insufficient as a matter of law to warrant consideration.

Finally, appellants cite *Union Carbide*, supra. In that case the question was whether the description of the process in the patent was sufficient to enable a person skilled in that art to practice the invention. The court generalized broadly that where "the patentee omitted elements which he knew were important, fraud will be implied by the fact-finder." 194 F.2d at 827. The defendants had argued that the invention would have worked *better* if the patentee had disclosed certain procedural steps which, admittedly, at the time of the filing of the application were of questionable value. The court also generalized that a patentee must disclose "the whole truth relative to their invention." The court affirmed the judgment of the trial court which found the patent valid and infringed.

Broad generalizations drawn from prior decisions solve few problems and often are cited incorrectly for propositions which they do not support. The issue in dispute in *Union Carbide* was whether the terms of 35 U.S.C. § 112 had been satisfied. As we have previously noted, appellants concede this issue here. Thus appellants' reliance on *Union Carbide* seems to have been misplaced.

The theory of appellants' arguments appears to have been extracted from the following statement concerning Constructive Reduction to Practice to be found in Rivise & Caesar, Interference Law & Practice, Vol. 1, Sec. 158, at p. 497. It is there stated:

> The third prerequisite [for an applicant to be entitled to rely upon the filing date of a patent application for his reduction to practice] is that the application relied upon for a constructive reduction to practice must be one that could result in a valid patent if *prosecuted to final allowance*.

Appellants, while footnoting the above statement with no particular emphasis, argue that the alleged deficiencies they have "found" in appellee's application are uncontroverted proof that appellee's application, if prosecuted to final allowance, could not result in a valid patent. The statement from Rivise & Caesar and appellants' reliance thereon is not supported by reference to any statutory provision or by case law. Rivise & Caesar refers the reader to section 13 in which the authors discuss and cite cases concerned with the alteration of an application after execution. This area of law was extensively reviewed by Judge Rich in Vandenberg v. Reynolds, 242 F.2d 761, 44 CCPA 873. Therein it was determined that the junior party was entitled to attack the sufficiency of the senior party's application as filed, on the grounds that it had been altered after execution, where the senior party relied on the filing date of the thus altered application as a constructive reduction to practice. It was there reasoned that a *decision on priority* rested on the sufficiency of the application as filed and the critical question raised, based on the allegations, was whether the application was void ab initio. An application burdened with such a defect could not, under the law, be relied upon as establishing a constructive reduction to practice because there was no sworn support for the altered application.

From the foregoing, it seems clear that appellants must have taken the statement from Rivise & Caesar out of context as the authors apparently intended only to cover the area of law which was more fully developed in *Vandenberg*, supra.

The dispositive issue here for decision is *priority of inventorship*. It is not whether appellee's parent application would result in a valid patent if prosecuted to final allowance.

In the instant case, priority of inventorship was awarded to Olin by the board because it found that Olin was the first

to conceive the invention and file an application on it with no argument to the contrary. Priority thus was determined on the basis of Olin's first conception plus his first constructive reduction to practice. This clearly is an adequate basis upon which to make a valid award of priority.

I do not question the authorities cited by the majority. It seems to me, however, that this appeal presents questions of patent law which are broader in scope than the majority opinion has chosen to deal with, hence my concurrence. I would predicate affirmance of the appealed decision on the failure of the arguments advanced by appellants in showing why appellee's parent application was so "incomplete" as to be insufficient as a matter of law.