48 CCPA

**Application of Raymond M. DODSON.**

**Patent Appeal No. 6703.**

United States Court of Customs and Patent Appeals.

July 21, 1961.

Watson, Leavenworth, Kelton & Taggart, John R. Janes, New York City (John T. Kelton, New York City, and Helmuth A. Wegner, Chicago, Ill., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Judges, and Judge WILLIAM H. KIRKPAT-RICK.[1]

MARTIN, Judge.

This is an appeal from a decision of the Patent Office Board of Appeals affirming the examiner's rejection of all of the claims of appellant's application for a patent on "1-Aryl-3-Hydroxypropyl Sulfones" and a process of making them.

Appealed claims 1 through 8 are for organic compounds with varying degrees of specificity. Appealed claims 9 and 10 recite a step in a process for preparing the claimed compounds. The following claims are representative:

"1. A compound of the formula

$$R-SO_2\underset{\underset{R'}{|}}{C}HCH_2\underset{\underset{R'''}{|}}{\overset{\overset{R''}{|}}{C}}-OH$$

wherein R is selected from the group consisting of methyl and phenyl radicals, R' is selected from the group consisting of phenyl and halophenyl radicals, and each of R'' and R''' selected from the group consisting of methyl radicals and hydrogen.

"2. 3-Phenyl-3-phenylsufonylpropanol.

"9. In a process for the manufacture of compounds of the formula

$$R-SO_2\underset{\underset{R'}{|}}{C}HCH_2\underset{\underset{R'''}{|}}{\overset{\overset{R''}{|}}{C}}-OH$$

wherein R is selected from the group consisting of methyl and phenyl radi-

cals, R' is selected from the group consisting of phenyl and halophenyl radicals, and each of R'' and R''' is selected from the group consisting of methyl radicals and hydrogen, the step which comprises contacting a furan derivative of the formula

wherein R, R', R'', and R''' have the meanings hereinabove assigned, with a base in the presence of water."

The application describes the preparation and certain of the physical properties of organic compounds within the scope of claim 1 which is the broadest compound claim. It appears that the examiner and the board found that the claimed compounds are new and unobvious. The sole ground of rejection relates to the utility of the claimed compounds. No distinction was made by the Patent Office between the compound claims and the process claims and appellant did not urge that there is a distinction. For this reason, in deciding the issues before us, we will not distinguish between the compound and process claims.

With regard to the rejection, the following sentences of the amended specification are the only pertinent portions thereof:[1]

"The compounds of this invention are useful for the relief of conditions inimical to the well-being of the animal body. Specifically, the sub-

1. United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28 United States Code.

1. In the application as filed in the Patent Office, this paragraph read as follows and was later changed to its present form by appellant's amendment:

"The compounds of this invention are useful in medicine for the treatment of disease and the relief of conditions inimical to the well-being of the animal body. Specifically, the instant compounds are valuable because of their capacity for exercising a depressant effect on the

ject compounds manifest noticeable anti-iritic [2] properties.

  &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

" &ast; &ast; &ast; The compounds may be therapeutically administered in solid form as tablets or capsules; dissolved in aqueous media, they may be given parenterally."

In his first action, faced with the original specification (see footnote 1), the examiner stated:

"All the claims are rejected as lacking utility since there is presented insufficient proof of utility. The disclosure contains the allegation that the instant compounds 'are useful in medicine for the treatment of disease &ast; &ast; &ast; specifically, &ast; &ast; for exercising a depressant effect on the heart muscle &ast; &ast; &ast;' etc. 'Clear, convincing, scientific proof such as will induce acceptance by the medical profession is required.' &ast; &ast; &ast; "

Thereafter, appellant submitted an affidavit of Victor A. Drill which "affords biological confirmation—in a representa-

tive product of the application, 3-phenyl-3-phenylsulfonylpropanol [the compound of claim 2]—of the type of activity set forth in the specification, and demonstrates that Applicant's statement of the usefulness of his compositions is solidly based in fact, rather than merely speculative." [3] [4]

The examiner considered this affidavit but adhered to his rejection, making it final and stating in part:

" &ast; &ast; &ast; there is disclosed a number of medical uses and there is insufficient proof for any of them. The affidavit &ast; &ast; &ast; attempts to show that these compounds are effective anti-iritic agents. However, the tests were on rabbits rather than humans and show only that in the special type of experiment used, inflammation is prevented. There is insufficient proof that it will cure iritis or that it is safe for use in humans."

Subsequently, appellant proposed amending his application by cancelling part of the utility disclosure (see foot-

---

heart muscle. Such quinidine-like activity is beneficial in the treatment of auricular fibrillation and flutter, paroxysmal tachycardia, and diverse other cardiac dysfunctions associated with rhythm changes of the heart caused by disturbances in the regular automaticity or conductance pattern of its beat. Additionally, the subject compounds manifest comparatively unilateral anti-iritic properties. Distinct from cortisone, a preferred anti-inflammatory agent renowned for the spectacular range of its other physiologic effects, compounds of the present discovery protect against the hyperemia characteristic of particular types of iritis without manifestation of multiple complicating side actions."

2. Dorland's "Illustrated Medical Dictionary," 23rd Ed., p. 693 (1957) defines "iritic" as "Pertaining to or of the nature of iritis," and "iritis" as "Inflammation of the iris, usually marked by pain, congestion in the ciliary region, photophobia, contraction of the pupil, and discoloration of the iris."

3. This quotation is taken from the letter of appellant to the examiner which accompanied this affidavit.

4. The pertinent portions of this affidavit are as follows:

" &ast; &ast; &ast; 3-phenyl-3-phenylsulfonylpropanol was assayed under the code number, SC–5576, for the purpose of evaluating its anti-inflammatory activity —specifically, the prevention of iritis.

"The technique used is an adaption of the method of Woods and Woods [sic], Bulletin of Johns Hopkins Hospital, 87, 482 ff., November, 1950, and can be summarized as follows:

" 'Each of a group of 8 normal rabbits is given an anterior chamber injection of 0.05 cc. of a 1:12,000 dilution of jequirity infusion in one eye and a mixture of 0.05 cc. of the same solution plus 500 $\gamma$ of the test compound in the other eye. The eye treated with jequirity solution alone develops an inflammation characterized particularly by hyperemia of the iris, and serves as a control. Co-administration of an active anti-inflammatory agent such as cortisone prevents the development of the iritis.'

"By the foregoing procedure, it was established that SC–5576, like cortisone, is an effective anti-iritic agent."

note 1). The examiner refused entry of the proposed amendment, agreeing however to enter it for purposes of appeal,[5] stating:

> "* * * the disclosure, if amended, would state that the compounds are useful for the relief of conditions inimical to the well-being of the animal body. Specifically, the subject compounds manifest valuable anti-iritic properties. Since iritis is primarily a disease of humans, it must be shown that these compounds are safe and effective in the treatment of iritis. * * *"

In response, in order to "destroy the presumption indulged in by the Examiner that the claimed products are unsafe to use," appellant then submitted a second affidavit of Victor A. Drill.[6] This affidavit did not persuade the examiner to change his position and in his answer to appellant's brief before the Board of Appeals, the examiner stated:

> "All the claims are rejected solely for lack of utility in the absence of clear and convincing proof that the compounds are safe, effective and reliable for use in humans for the therapeutic effect set forth in the specification. * * *"

It appears to have been the examiner's position before the board that relief of conditions "inimical to the well-being of the animal body" implies use of the compounds to treat iritis in man, that the disclosure does not exclude use in man and does not specifically teach use in animals other than man, and that where "therapeutic use in man is relied upon for a showing of utility, this utility must be established by competent evidence." The examiner also stated:

> "* * * In the present case the question is *whether there is sufficient proof of utility to meet the statutory requirement for the grant of a patent.*" [Emphasis ours.]

The board affirmed the decision of the examiner, stating:

> "Since our interpretation of the statement of utility in the specification coincides with that of the examiner, we think it becomes necessary for appellant to establish usefulness of his compounds for treating human beings. * * *"

Another pertinent part of the board opinion is as follows:

> "We are not aware that any breeder of experimental animals, such as mice, guinea pigs or rabbits, has ever administered medication thereto for the sole purpose of saving such animals. In general, their economic value is insufficient to warrant treatment. The Patent Office has heretofore regarded this type of test as simply a necessary preliminary step in the process of evaluating any new drug prior to clinical use on humans, or in the case of veterinary medicine on the commercially valuable animals but not as establishing usefulness within the meaning of 35 U.S.C. 101. Any compound which has not been carried beyond this stage of experimentation we think may properly be regarded as of merely speculative or at best potential utility. We believe appellant will concede that thousands of such potential drugs have in the

---

5. The amendment was subsequently entered for that purpose.

6. The pertinent portions of this second affidavit are as follows:
   "* * * Affiant states that it is standard practice, when assaying antiinflammatory activity by the procedure used in evaluating 3-phenyl-3-phenylsulfonylpropanol (SC–5576), to watch for and remark whatever evidence of toxicity presents itself. Thus, for example, in the

3-month period bracketing the time when SC–5576 was tested and found useful as an anti-iritic agent, other compounds identically assayed were reported to produce such diversely undesirable responses as irritation, myosis, mydriasis, and the development of a purpose coloration.
   "Contrasting with this, the record shows that 3-phenyl-3-phenylsulfonylpropanol inhibited iritic hyperemia without any manifestation of objectionable side-effects during such use."

past had to be discarded as unsuited for practical application because of failure to react similarly or with sufficient safety when tested on man."

Thus the basic position of the board appears to have been that utility within the meaning of 35 U.S.C. § 101 had not been established because the results of clinical tests on humans had not been submitted.

The issues present in this case are substantially the same as those in In re Krimmel, 292 F.2d 948, 48 C.C.P.A. ——. The only difference between the two cases is in the words used to describe general utility. In the Krimmel application, utility is expressed as "pharmaceutical applications," while in the instant application, it is expressed as "relief of conditions inimical to the well-being of the animal body." For the purposes of this case, we see no significant distinction between these two expressions. Moreover, both applications now specify essentially the same specific utility, recited in the instant application in terms of the claimed compounds manifesting "noticeable anti-iritic properties" and in the Krimmel application in terms of the claimed compounds being effective "in treating inflammation of the iris."

In the instant case, appellant in his brief before this court has stated:

"* * * The term "the animal body" is a general reference to animals, and would be so understood by one skilled in this art. The term neither excludes the human body nor expressly includes it or indicates that the human body is a principal environment of use. No mention is made of human therapy or treatment of humans.

"There is no specific representation of efficacy in humans in the appellant's specification.

"There is therefore no justification in the appellant's disclosure for the Patent Office's singling out the human species for its requirement for a showing of utility. In view of the generic tenor of the disclosure and the failure to mention humans, a showing of pharmacological effectiveness in any animal verifying the asserted utility should suffice."

The solicitor, on the other hand, urges that appellant clearly contemplates treatment of humans and that, accordingly, "proof of utility in a rabbit does not constitute proper evidence of a corresponding utility in man, in the absence of a proper basis for assuming a correlation between the results of tests of the claimed compounds on rabbits and the results of corresponding tests on man."

For reasons set forth in the Krimmel case, we do not decide whether an applicant must, in a situation as before us now, provide evidence that claimed compounds are useful for a purpose stated in a patent application. Rather, we will decide this case on the basis of the evidence before us. Moreover, although the solicitor has criticized the Drill affidavit here as he did in Krimmel, for reasons set forth there, we will assume the affidavit here establishes what it purports to establish, i. e., that the claimed compounds are effective anti-iritic agents in rabbits.

The main issue in this case is the same as it is in the Krimmel case. For reasons as set forth there, we hold that appellant here has established by the Drill affidavits that one of his claimed compounds is useful for a purpose alleged in his application and that, therefore, he has satisfied the requirement of 35 U.S.C. § 101 that the claimed invention be useful, even though his immediate or ultimate *though unexpressed* aim be to use the claimed compounds to treat humans.

For the foregoing reasons, more fully set forth in our opinion in In re Krimmel, the decision of the Board of Appeals is *reversed*.

Reversed.

WORLEY, C. J., concurs in result.

KIRKPATRICK, J., sat but did not participate in decision.