Application of Robert R. CITRON.

Patent Appeal No. 7042.

United States Court of Customs
and Patent Appeals.
Dec. 12, 1963.
Rehearing Denied Feb. 3, 1964.

See, also, CCPA, 325 F.2d 254.

James H. Littlepage, Washington, D. C.
(Herman Hersh, Ooms, McDougall &
Hersh, Chicago, Ill., of counsel), for appellant.

Clarence W. Moore, Washington, D. C.
(Raymond E. Martin, Washington, D. C.,
of counsel), for the Commissioner of
Patents.

Before WORLEY, Chief Judge, and
RICH, SMITH and ALMOND, Judges.

RICH, Judge.

This appeal is from the decision of the
Patent Office Board of Appeals affirming
the rejection of all claims of application
serial No. 419,683, filed March 30, 1954,
entitled "Compositions and Methods for
Producing Same." The application is
described as a continuation-in-part of applications serial No. 74,488, filed February 3, 1949, No. 163,787, filed May 23,
1950, and No. 194,393, filed November 6,
1950.

The claims remaining are 13–16 and
20. Claims 13–16 are directed to a composition which is a precipitate and claim
20 is directed to a serum. Claim 13
reads:

"13. A composition consisting of
the precipitate formed by the dilution with benzene of the extract of
cancer tissue with acetone and water

present in the ratio of 3–15 parts by weight of the water phase to 97–85 parts by weight acetone and in which the materials are present in the ratio of more than 4 parts by volume of benzene to 1 part by volume of the water and acetone solution."

Claims 14, 15, and 16 specify the "cancer tissue" of claim 13 to be human, rat, and rabbit carcinoma respectively and omit the final limitation of claim 13 as to the 4:1 minimum ratio of benzene to water and acetone solution.

Claim 20 reads:

"20. A serum containing antibodies comprising the blood extracted from a cancer-free animal into which injections of the compositions of Claim 13 have been periodically made in small amounts until the same antibody is present in concentrations detectable in a dilution of at least $\frac{1}{2560}$."

The following publications have been cited as references and relied on in support of the rejection:

Lumsden, Am. J. Cancer, Vol. 15, April, 1931, pages 608–609.

Maver, J. Natl. Cancer Inst., June, 1944, pages 571–572.

Chambers, et al., The British J. of Experimental Pathology, Vol. 15, 1924, pages 1–12.

There are two remaining grounds of rejection of all claims. First, they are rejected on the references "as unpatentable over Lumsden, or Lumsden combined with Chambers et al. and Maver." Second, the board affirmed "the Examiner's rejection of all the claims as being based upon a disclosure containing allegations of utility, which cannot be accepted as operative absent clear and convincing proof thereof."

Since we dispose of the case on the latter rejection—failure to support challenged assertions with respect to utility of claimed compositions—we find it unnecessary to discuss the rejection on prior art. In re Novak et al., 49 C.C.P.A. 1283, 306 F.2d 924.

To understand the rejection to be discussed it is necessary to have in mind the general nature of the invention and the assertions with respect to its utility contained in appellant's specification, which is rather long, occupies 23 printed pages of the record and contains 13 so-called "Examples," many of which, we note, do not exemplify anything in the nature of a specific test, experiment, or operation. To explain the invention defined in claim 13, supra, we shall paraphrase "Example 4."

Human "cancer tissue" (of unspecified type) either fresh or freshly frozen, is extracted with a solvent consisting of acetone containing from 3 to 15 percent by weight of water, which is said to remove from the tissue a "lipid antigen." One volume of the acetone-water extract solution is mixed with from 4 to 8 volumes of benzene which is said to result in the throwing down of a "white precipitate" which is separated in any suitable manner such as decantation, centrifuging, or filtration. The precipitate is further washed with benzene. The specification then says:

"This white precipitate has been identified as the hormone or hormone-like material which is *the active constituent* in the extracts of Example 1." [Emphasis ours.]

"The precipitate that is formed appears as a crystalline material to the naked eye but is actually an emulsoid suspension and resembles miniature snowflakes in appearance and in the manner in which the particles form and settle out in benzene. When the white precipitate is dried, a gummy residue of a dark greyish-brown to black color is obtained."

"Example 1," referred to above, describes the making of extracts as follows: 25 grams of ground Brown-Pearce cancer tissue from a rabbit are extracted with 250 ml. of ethyl ether with agitation for an hour. The solvent phase "together with any lipid sediment or suspended material is separated from the residue by decantation. The solvent contains the

ether soluble constituents of the original cancer tissue." The specification then contains the following:

"The composition of the materials extracted by the ethyl ether solvent has not been broken down into its individual components and it is doubtful that such fractionation or separation can be effected without destroying or without interfering with the activity of the ingredients or ingredient in the extract *which supply the effect for stimulating cancerous growth* under some conditions *or* the ingredient or ingredients which *cause the development of an antiserum which is antagonistic to the growth of cancer.* To establish the differences in composition in the environment in which it is effective, I have resorted to analysis by infrared ray absorption of the deposit made from acetone solution. Such infrared ray analysis is effective to establish groupings that are new in this composition and not present in similar extracts from *normal* tissue. These differences in groupings and arrangements evident from the analysis of the *acetone deposit of the ether extract* secured by Example 1, as set forth by infrared ray analysis, Figure 4, are believed representative of the compounds present in the environment in which they are contained that impart the *activity* either in *stimulating cancerous growth* or in *building up antiserums* in cancer-free bodies since comparable reactions are not available with the extracts from *normal* tissue having the composition illustrated in Figure 3." [Emphasis ours.]

The figures of the drawings above referred to consist of six infrared absorption spectra of "the acetone deposit from [or of] an ether extract of" the following: 1. normal human skin tissue, 2. human carcinoma, 3. normal rabbit tissue, 4. Brown-Pearce rabbit carcinoma, 5. normal male rat skin, and 6. Walker rat carcinoma. As can be seen, 1, 3, and 5 are spectra of extract from normal tissue and 2, 4, and 6 are apparently spectra of the acetone-soluble composition of the invention.

Up to the time of filing his brief in this court appellant had in his application claims 1–9 to compositions and sera which depended for identification solely on the infrared spectra of the drawings. These claims were under rejection as indefinite on the ground that an infrared spectrum alone is not sufficient to describe a chemical compound and is particularly inadequate to define a composition which appears to be a mixture. Appellant abandoned his appeal with respect to claims 1–9.

From the specification as a whole and as indicated by the foregoing, it appears that appellant wishes to patent a certain precipitate extracted and precipitated from "cancer tissue" by solvents used in a certain sequence and admixture and also wishes to patent a serum allegedly produced by injecting his precipitate into a cancer-free animal which produces antibodies in response to some antigen contained in the precipitate. It is clear that the chemical composition of the precipitate is unknown to appellant.

It is next necessary to take note of the assertions of utility or usefulness of the composition of this invention which the specification contains. We will first quote the opening and closing statements, respectively:

"While the discussion herein will relate to the use of these compounds and compositions or intermediates as materials employed in the *cure* of cancer, it will be understood that the invention being *claimed* is to the intermediates and compounds per se and to the methods for manufacturing same as distinguished from the cure of any disease or ailment, such as cancer.

\* \* \* \* \* \*

"Although specific description has been made of the use of these compounds in the *cure* of cancer, invention described and *claimed* herein will be limited for the present to

such *compositions* and *compounds* as distinguished from their use as in the following claims." [Emphasis ours.]

As above indicated, it is true that the claims are all directed to compositions. There are no method claims notwithstanding the title of the application, not even to the method of manufacture of the compositions. Therefore, whatever statements the specification contains about utility are necessarily directed to the use and usefulness of the compositions. We quote some of them (all emphasis being ours):

"I have discovered that cancer tissue in general, whether taken from humans, rats or rabbits, or other mammals, contains a liquid [lipid?] antigen compound identified by infrared ray studies as a lipid fraction of a protein complex containing haptens *which are specific immunologically*. These extracts containing the lipid fractions have been further identified as having the properties of a hormone in that they exhibit marked endocrine effects on the ovaries of the respective animal. Upon repeated injection in a rabbit with the Brown-Pearce lipid antigen extract or in a rat with the Walker lipid antigen extract or in adult females with human lipid antigen, the ovaries show changes characteristic of pregnancy. These extracts exhibit generalized luteinization which is characteristic of large dosages of progesterone \* \* \*.

"These hormone substances derived from cancer tissue are not species specific from the experimental evidence to date which clearly indicates activity and *clinical effectiveness* of both the Brown-Pearce and Walker lipids in the human. \* \* \*

"While the extracts produced in accordance with this invention from the lipid antigen of the Brown-Pearce carcinoma or Walker carcinoma or from human carcinoma are growth stimulating in the presence

of cancer tissue, they have been found to be *effective in producing antiserums* in cancer-free bodies *which are highly antagonistic to the growth of cancer.*

\* \* \* \* \* \*

"The precipitates of Examples 4–8 or the extracts of Examples 1–3 of the cancerous tissue having the compositions set forth in Figures 2, 4 and 6 are *effective for use in the manufacture of a new antiserum composition which may be used effectively to combat the growth of cancer and which are highly antagonistic to the conditions for cancerous formation and growth.*"

Speaking in "Example 11," of the production of serum in rabbits injected with the ether extract prepared from human cancer tissue or the white precipitate prepared in various ways from various cancer tissues, the example concludes:

"Such serum has been found to exert a powerful antagonistic [sic] to the inception and to the growth of certain types of cancer."

"Example 13" opens with reference to "The blood serum of an animal treated with the white precipitate, or its evaporated residue, or with the ether extract prepared in accordance with the previous examples" and contains the following statements about the serum:

"Such serum exerts a powerful action antagonistic to the inception and growth of at least certain types of cancer and may be employed in the *treatment of human cancer* in the manner described. \* \* \*

"Administration of the serum to rats suffering from Walker carcinoma is extremely effective causing necrosis and regression of the cancerous tissue. \* \* \*

\* \* \* \* \* \*

"Blood serum obtained as previously described containing antibodies have [sic] been found *effective in the treatment of at least some human cancer* when administered two to three time weekly, or oftener, over a

considerable length of time. * * * In cases where the patient shows good tolerance, massive doses may be administered intravenously or intraperitoneally to secure accelerated action." [Emphasis ours.]

In the next paragraph, which is the last paragraph of the specification purporting to describe the invention, is the following:

"Relief from pain and other acute symptoms, sometimes quite striking and dramatic, is one reliable indication of effectiveness of the serum in some patients. *Another evidence of effectiveness is the sloughing of cancer tissue, which has been observed to take place* to an extent corresponding to that resulting from strong X-ray treatments but without any of the undesirable side effects of radiation therapy. Such *effectiveness of the serum* in the antibodies produced in accordance with this invention *has been demonstrated in human beings suffering from various cancers.*" [Emphasis ours.]

In view of the foregoing, we cannot take seriously the opening statement in appellant's brief: "There is no claim here to a cure for cancer, as indicated by the Board of Appeals in its rejection on the ground of utility." If by this statement appellant means that he is not claiming, in the patent claim sense, the *method* of curing cancer but only the compositions, we would observe that it makes no difference. What we are here concerned with is the assertions of utility made with respect to those compositions. As to what claims are made in this respect we look to the specification, which speaks for itself, not to the brief.

The examiner's final rejection included as one ground: "All claims are again rejected as for the lack of utility. * * * proof of the alleged utilities, i. e. curing cancer, is necessary." After appeal was taken to the board, the examiner's answer reiterated his position, saying:

"All claims are rejected as lacking utility since applicants [sic] have

not proven their allegation on page 1, last paragraph of the specification, that applicants' [sic] products are a cancer cure. There has been no clinical data submitted to prove this allegation. Applicant's allegation that the products are intermediates is not convincing since this allegation is vague and there is no indication for what the compound is an intermediate. If applicant considers antigens as intermediates for forming antisera therefrom, applicants [sic] still has not proven that product is useful as an antigen. * * * the burden [is] on applicants [sic] to prove their allegations of utility * * *."

In affirming, the board said:

"We are also in agreement with the Examiner's rejection of all the claims as being based upon a disclosure containing allegations of utility, which *cannot be accepted as operative absent clear and convincing proof thereof.* The compositions have been alleged to be cures for cancer, including human cancer, and *in view of the art knowledge of the lack of a cure for cancer and the absence of any clinical data to substantiate the allegation,* the claims include compositions directed to an apparently inoperative utility. The compositions claimed are not, therefore, useful within the meaning of 35 U.S.C. 101. Reference is also made to our similar previous holdings in Appeal No. 314–15 and 393–86 in parent applications of this application. [Emphasis ours.]

* * * * * *

"Since the disclosure of the cure of human cancer as a field of utility is incredible and misleading unless proven by statistically significant evidence, the rejection is deemed to be sound whether or not other stated utilities are valid."

The board concluded its discussion of this rejection by observing that there is "no verified proof in the record before us

of operativeness of appellant's invention as applied to animals or to humans." Ex parte Moore et al., 128 U.S.P.Q. 8, was cited. That was a board decision in a case also containing a statement of utility suggesting possible use of claimed compounds in the treatment of cancerous diseases.

██ We approve the board's decision affirming the rejection based on section 101 and the rationale that where claimed compounds are alleged in the specification to have a utility of as much public importance as is the effective treatment of cancer, which alleged utility appears to be incredible in the light of the knowledge of the art, or factually misleading, applicant must establish the asserted utility by acceptable proof. In re Novak et al., supra, was another case which came before us recently in which an alleged utility as a drug or medicament was questioned by the Patent Office and the applicant failed to support it by evidence. We said:

> "In our opinion, when an applicant bases utility for a claimed invention on allegations of the sort made by appellants here, unless one with ordinary skill in the art would accept those allegations as obviously valid and correct, it is proper for the examiner to ask for evidence which substantiates them."

No evidence was forthcoming in that case and we affirmed the rejection on the ground of *lack of proof of utility*. We do the same here.

██ The board's opinion in Ex parte Moore et al., supra, contains some points which we think worthy of mention and approval. One is that a rejection, as here, for the purpose of enforcing compliance with the requirement that statements of utility deemed incredible or misleading must be either removed or proved is proper notwithstanding there may also be present in the application other proper and acceptable assertions of utility. Another is that the reason behind the requirement, as pointed out by the examiner in the Moore case, is that it is against public policy to place the oblique imprimatur of the Government via the patent grant on incredible or misleading unproven assertions in view of the possibility of exploitation of such statements in issued patents by unscrupulous persons. This does not mean, however, as is sometimes implied from the dictum in Isenstead v. Watson, D.C., 157 F.Supp. 7, that there should be a reluctance to grant patents on new chemical compounds just because they may eventually find use in the treatment of human disease. We are here concerned only with what assertions are made about the utility of compounds or compositions.

Appellant attempts to find support for allowance of his application in our decisions in the cases of In re Krimmel, 48 C.C.P.A. 1116, 292 F.2d 948; In re Dodson, 48 C.C.P.A. 1125, 292 F.2d 943 and In re Johnson, 48 C.C.P.A. 733, 282 F.2d 370. They are clearly distinguishable. The Krimmel and Dodson cases were decided on the basis of utilities established by credible evidence. The Johnson case did not involve the issue we have here but the question whether a parent application contained a *disclosure* of utility. The defect here is that in spite of the somewhat grandiose claims of appellant's specification, purportedly based on actual tests or experiments, not one iota of evidence has been produced tending even to show that tests were actually conducted. We also note that the specification does not contain a single *specific* experiment, of which the details are supplied, wherein any animal was actually benefited by treatment with the claimed precipitate or serum, or wherein an existing tumor was caused to grow more rapidly.

One ground of rejection of all claims having been found sufficient, the other ground based on prior art is not considered.

The decision of the board is affirmed.

Affirmed.

MARTIN, J., did not sit or participate in decision.

SMITH, Judge (concurring).

The determinative issue in this appeal concerns the failure of appellant to supply proofs of asserted utility as requested by the examiner. The rejected claims cover a composition (cl. 13–16) and a serum (cl. 20). The application contains assertions of utility for such composition and serum but these were not accepted by the examiner in the absence of proofs. Appellant neither filed proofs nor challenged the examiner's demand for proofs as being unreasonable in this case. Such a record requires affirmance on these grounds alone and does not require us to attempt an analysis of the utility asserted nor to consider any other issue.

I therefore concur with the result, solely on the basis of this issue.