52 CCPA

**Application of Karl FOLKERS and Clifford H. Shunk.**

**Patent Appeal No. 7304.**

United States Court of Customs and Patent Appeals.

May 6, 1965.

I. Louis Wolk, Rahway, N. J., Raymond Underwood, Philadelphia, Pa., for appellants.

Clarence W. Moore, Washington, D. C. (J. E. Armore, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

WORLEY, Chief Judge.

Folkers and Shunk appeal from the decision of the Board of Appeals which affirmed the examiner's rejection of claims 1–10 of their patent application [1] for "2,3-Dimethoxy-5-Methyl-Benzoquinones."

The subject matter is reflected in claim 1:

"1. A compound selected from the group consisting of

and

in which n is an integer from 1 to 6."

The Patent Office has found appellants' compounds to be new and unobvious. The sole issue here is whether the following paragraph of appellants' specification is sufficient to satisfy the requirements of 35 U.S.C. § 101 [2] and 35 U.S.C. § 112: [3]

"The 2,3-dimethoxy-5-methyl benzoquinones containing the type of isoprenoid substituents shown * *

have activity similar to that found in Q-275. Q-275 is a compound isolated from beef heart mitochondria by F. L. Crane, Y. Hatefi, R. L. Lester, and C. Widmer [Biochem. Biophys. Acta, 25, 220 (1957)]. This material is also named Coenzyme Q in later publications. It is involved in the electron transport activity of the mitochondria."

The examiner rejected all claims "as being based on a defective disclosure

---

1. Serial No. 757,464, filed August 27, 1958.

2. Section 101:
   "Whoever invents or discovers any new and *useful* * * * composition of matter * * * may obtain a patent therefor, subject to the conditions and requirement of this title." [Emphasis supplied].

3. Section 112:
   "The specification shall contain a written description of the invention, and of the *manner* and process *of* making and *using it*, in such full, clear, concise, and exact terms *as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to* make and *use the same* * * *." [Emphasis supplied].

in that there is no disclosure of utility." In regard to the above excerpt from appellants' specification, he said:

"From this statement one learns nothing about utility. It merely says what was shown by Crane et al. of record, namely that the compounds involved undergo electron-transfer (oxidation reduction) in certain biological systems. It in no way shows what pratical result may be obtained or how any practical problem may be solved or how to use the compounds in any way to produce any desired result. * * "

The examiner referred to the textbook of Fruton et al.[4] as exemplary of references which show that electron-transfer is the same as oxidation-reduction. He then noted that Fruton and "many other works" show that quinones in general are electron transfer systems. He referred to pages 289–291 of Fruton where the following reversible reaction involving hydroquinone and quinone is given as illustrative of oxidation-reduction reactions:

Hydroquinone $\longrightarrow$ Quinone $+ 2H^+ + 2e$

The examiner concluded:

" * * * In short, electron transfer is a physicochemical property and not a utility. We do not know from the record before us that Q-275 has any utility at all. The best that could possibly be said is that since Q-275 has biological *activity* (electron transfer properties) it *may* be useful in some manner (as many such systems are useful as shown by Fruton et al). In effect, appellants argue that since the claimed compounds possess similar properties in a physio chemical sense then the claimed compounds *may* have a utility similar to that of Q-275. This is obviously compounding one probability with another and the result becomes even less probable. Certainly the appellants have not taught the art that their compounds are useful in any way and even more certainly they have not taught the art *how to use* the claimed compounds to produce any desired practical result. * * * "

The board agreed with the examiner's position, adding:

" * * * It [the controverted paragraph] appears to us to be nothing more than an invitation to experiment to find a utility, which experimentation would have to be extensive. * * * "

To understand the basis for the examiner's reasoning it is necessary to set forth the following portions of the Crane article relating to Q-275 which appellants incorporated by reference in

4. Fruton and Simmonds, "General Biochemistry," 2nd Edition (1958) The examiner quoted the following definitions from page 289 of Fruton:
" * * * Oxidation is defined as withdrawal of electrons from a substance, whether or not there is an accompanying addition of oxygen, and whether or not there is an accompanying loss of hydrogen. * * * The reverse of each of these oxidation reactions is a reduction process and the definition of reduction as a reaction in which electrons are added to a substance, is obvious."

the quoted paragraph of their specification:

"From lipid extracts of beef heart mitochondria [5] we have isolated a new compound capable of undergoing reversible oxidation and reduction. * * * The oxidation-reduction behavior as well as the infra-red spectrum indicate that the compound is a quinone.[6] For convenience it will be referred to as Q-275. * * *

"In addition to beef heart mitochondria, Q-275 has been found in various electron transporting particles derived from these mitochondria. The concentration of Q-275 (mg/g protein) was found to be as follows: Mitochondria, 2.5; ETP [7] 2.7 * * *. The presence of Q-275 appears to be correlated with succinate oxidizing capacity.[8]

"That Q-275 is involved in the electron transport activities of the aforementioned particles is indicated by several lines of evidence.

"I. After exposure of mitochondria to air, the extracted compound is observed to be in the oxidized [quinone] form. After a short incubation in the presence of succinate and cyanide, the compound then appears in the reduced form. * * *

"II. It has been possible to show that the oxidation and reduction of externally added Q-275 is catalyzed by mitochondria and derivative particles. Reduction of added Q-275 by succinate occurs in the presence of mitochondria * * *. The oxidation of the chemically reduced compound is catalyzed by mitochondria * * *.

"III. When mitochondria or ETP are extracted with heptane or 2,2,4-trimethylpentane, Q-275 appears in the organic solvent. This extraction decreases the succinoxidase activity; addition of Q-275 restores the initial activity. * * * [see Table I] * * *. Other compounds which were tested as substitutes for Q-275 either had no effect or inhibited the low blank rate. The compounds * * * tested which had no effect were p-xyloquinone; menadione; 2-hydroxy-1,4-naphthoquinone; * * bovine serum albumin; $d$-$\alpha$-tocopherol; vitamin $K_1$; 6-carotene; 2,3-dimethyl-1,4-naphthoquinone; 2-undecyl-1,4-naphthoquinone; and tuna fish oil. * * * All these compounds were added at concentrations comparable to that of Q-275.

5. Mitochondria are morphological units of the cell, the basic structure component of living systems.

6. The record shows the structural formula of Q-275 to be:

7. ETP is a shorthand designation for electron transfer particles, one of several subfractions derivable from mitochondria.

8. Fruton at pages 358–59 describes succinate as one of the metabolites oxidized during metabolism in a living organism.

A multienzyme system, termed succinoxidase, is the "catalyst" responsible for transfer of electrons from succinate to oxygen. Appellants have determined Q-275 to be a coenzyme, a material defined by Fruton (page 307) as a substance essential to enzyme action.

Table I
Effect of Q-275 on Succinoxidase

| Enzyme Treatment | Additions | Activity $\mu$atoms oxygen/5 min/mg |
|---|---|---|
| None | ——— | 2.5 |
| None | Q-275, 0.08 mg. | 2.5 |
| * * * | * * * | * * * |
| Extracted | ——— | 0.4 |
| Extracted | Q-275, 0.08 mg. | 2.7 |
| * * * | * * * | * * * |

Assay for succinoxidase at 38° as previously reported * * *. 2.5 mg of ETP, and 1.58 mg of extracted ETP used in a total volume of 1.5 ml. Q-275 added in 0.03 ml. ethanol."

With that background information in mind, we must determine the correctness of the rejections under 35 U.S.C. §§ 101 and 112. From our evaluation of the record we are inclined to conclude that the board erred in both instances.

*Rejection Under 35 U.S.C. § 101*

■■ This case does not present an issue of *lack of proof* of the recited property-electron transport activity—or alleged usefulness. Neither the examiner nor the board has asserted that the compounds are incapable of undergoing oxidation-reduction reactions with other materials, particularly in mitochondria, or that such property is incredible or misleading. Thus it seems clear that the examiner thought one of ordinary skill in the art would accept appellants' allegations of activity as obviously valid and correct. Cf. In re Novak and Hogue, 306 F.2d 924, 49 CCPA 1283; In re Citron, 325 F.2d 248, 51 CCPA 852. Indeed, as the examiner points out, quinones in general are electron transfer systems, which lends credence to appellants' statement that the instant hydroquinone and quinone derivatives, like those of Crane, undergo electron-trans-

fer or oxidation-reduction. Rather, the examiner has taken the position that electron transfer is a physico-chemical *property* and not a *utility*.

We agree with the examiner that in many cases there is a difference between discovery of a property of a chemical compound and utilization of that property in a physical embodiment to accomplish a useful result. But what we think the Patent Office has overlooked here is that usefulness of a chemical compound is invariably a manifestation of a given property of that compound. We think some uses can be immediately inferred from a recital of certain properties. The question here is not whether the property of electron transfer is a use, but whether knowledge of that property necessarily and implicitly renders it readily apparent to one of ordinary skill that the present compounds are useful. We think logic and reason require an affirmative answer to the latter question.

On the facts of this case, we are of the view that appellants have satisfied the requirements of Section 101 by setting forth the fact their compounds are hydroquinones and quinones, and reciting that the compounds possess the property of electron transport activity. It is uncontroverted in the record before us that appellants' compounds are hydroquinone and quinone derivatives and share the property of oxidation-reduction capacity which hydroquinone and qui-

none compounds in general possess. Since appellants' newly discovered compounds belong to a class of compounds, the members of which have become well recognized as useful for a particular purpose because of a particular property, the only reasonable conclusion is that the new compounds, also possessing that property, are similarly useful. On its face, appellants' specification teaches one of ordinary skill in the chemical art that their compounds are useful as oxidizing or reducing agents and thereby promote the progress of science and the useful arts.[9] We are supported in our reasoning by The Encyclopedia of Chemical Technology, Interscience Publishers, Inc. (1951), one of the "many works" the examiner might have cited to show that quinones have electron transport activity, which speaks of hydroquinone and its derivatives as follows:

"* * * In recent years, hydroquinone has become one of the most widely *used* organic reducing agents, since it can be easily *oxidized* to quinone and quinone-like products. Its *reducing action* is the basis for the extensive *use* of hydroquinone as a photographic developer and as an oxidation inhibitor [antioxidant] for a wide variety of processes. * * *" [Emphasis supplied].

Under the subheading "Physical and Chemical Properties [of hydroquinone]", it is said:

"The easy oxidizability of hydroquinone is the *property* contributing most significantly to its *usefulness*. * * *" [Emphasis supplied].

We also agree with appellants that their compounds are useful to the biochemist in the study of enzyme systems which are responsible for and necessary to the life function of metabolism, the conversion of food to energy. Crane shows that he and his associates, as one facet of their investigation of enzyme systems, discovered that removal of the natural coenzyme, Q-275, from mitochondria and fractions thereof inhibited succinoxidase activity of the mitochondria fraction. They found that the succinoxidase activity could be restored by adding Q-275 in a specified concentration in ethanol to the extracted mitochondria. Other compounds of a quinone nature, but further removed in chemical structure from Q-275 than the presently claimed compounds, had no effect in restoring succinoxidase activity when added to the extracted mitochondria in concentrations comparable to that used for Q-275, hence were of no further use *in the study of that particular enzyme system*. On the other hand, appellants have effectively stated in their specification that their compounds have the activity of Q-275 and are of use in maintaining cellular succinoxidase activity in an *in vitro* system.

We think appellants have made a contribution to the art by inventing a new and unobvious composition of matter and have complied with the requirement of 35 U.S.C. § 101 that their invention be useful. We turn now to a consideration of whether the conditions and requirements of 35 U.S.C. § 112 have been met.

*Rejection Under 35 U.S.C. § 112*

In determining that question we recall the admonition set forth in In re Nelson and Shabica, 280 F.2d 172, 47 CCPA 1031:

"The basic purpose of the requirement that the specification contain a written description of the invention is to put those skilled in the art in possession of sufficient knowledge 'to enable' them to practice the invention. One cannot read the wording of section 112 without appreciating that strong language has been used for the purpose of compelling complete disclosure."

The specification must leave nothing to "speculation or doubt," In re Lorenz and Wegler, 305 F.2d 875, 49 CCPA 1227, or require one skilled in the art to experiment at great lengths before he can use the invention, In re Diedrich, 318 F.2d 946, 50 CCPA 1355. Yet we also recog-

9. Cf. Potter v. Tone, 36 App.D.C. 181 (1911).

nize that patent disclosures are not necessarily required to be meaningful and intelligible to the general public. They need not set forth minutiae of description or procedures perfectly obvious to one of ordinary skill in the art yet unfamiliar to laymen. As this court stated in In re Chilowsky, 229 F.2d 457, 43 CCPA 775:

> "It is well settled that the disclosure of an application embraces not only what is expressly set forth in words or drawings, but what would be understood by persons skilled in the art. As was said in Webster Loom Co. v. Higgins [et al.], 105 U.S. 580, 586, 26 L.Ed. 1177, the applicant 'may begin at the point where his invention begins, and describe what he has made that is new and what it replaced of the old. That which is common and well known is as if it were written out in the patent * * *.'"

When analyzed in light of the foregoing principles, we think appellants' specification satisfies both alternative mandates of 35 U.S.C. § 112 such that a person skilled in the biochemical art to which the invention pertains, as well as one skilled in the chemical arts with which the invention is most nearly connected, would be enabled to use the compounds of the invention without undue experimentation. The fact that the claimed compounds are derivatives related in chemical structure and significant properties to the "common and well known" family of hydroquinone and quinone compounds argues strongly for the proposition that those skilled in the chemical arts would, without more, know how to use them. In re Adams, 316 F.2d 476, 50 CCPA 1185. Moreover, when we consider Crane there can be no doubt that ample knowledge, including description of procedures, materials and suitable concentrations, has been imparted to one of ordinary skill in the art to enable him to use the compounds in the study of the succinoxidase enzyme system.

The decision is reversed.

Reversed.